Evelyn Tattershall, Respondent, v. Yellow Cab Company, Appellant.*—37 S. W. (2d) 659.

Kansas City Court of Appeals. March 2, 1931.

*Butcher & Knopp* and *John S. Jenkins* for respondent.

*Charles L. Carr* and *Hogsett & Boyle* for appellant.

ARNOLD, J.—Action in damages for personal injury alleged to have been sustained by plaintiff while a passenger in one of defendant's cabs which collided with another automobile at the intersection of Thirteenth and McGee streets in Kansas City, Missouri, on November 14, 1928.

Defendant is a corporation duly organized and existing according to law and engaged in the business of transporting passengers for hire, and for such purpose operates cabs in and upon the streets of said city. Plaintiff is and was a resident of Kansas City, Kansas. The suit was instituted on December 18, 1928, and an amended petition upon which the cause was tried was filed on February 4, 1929. The amended petition is formal and alleges plaintiff became a passenger in one of defendant's taxicabs, the same being operated and driven under the exclusive control of defendant's agent, employee and driver, on or about November 14, 1928; that while a passenger, as aforesaid, and while being carried on or along McGee street, a public thoroughfare in Kansas City, Missouri, near and at the intersection of Thirteenth street, another thoroughfare in Kansas City, Missouri, defendant—"carelessly and negligently

caused and permitted the taxicab within which plaintiff was riding as a passenger to come into violent collision with an automobile, and immediately subsequent thereto, also into violent collision with a street curbing; that said collisions were occasioned without any fault on the part of the plaintiff but by reason of the carelessness and negligence, as aforesaid, of the defendant." And plaintiff states that by reason of said collision she was thrown violently into and against the sides and upon the floor of said conveyance, receiving thereby a serious injury on the left side of her head above the ear and near the temple, severely bruising and contusing that part of plaintiff's head; a violent and severe blow on her left arm, wrenching and contusing the same; her left hip was struck a violent blow, severing and tearing the ligaments and tendons of the hip joint thereof; that her left leg and foot were bruised, contused and sprained; that her lower back was bruised, twisted, wrenched, sprained and strained; her nervous system received a severe and permanent shock, causing sleeplessness and restlessness; that the ligaments, tendons and muscles of the wall of the left portion of her abdomen were bruised, contused, sprained, wrenched and torn; that plaintiff has suffered great physical pain and mental anguish and will in the future continue so to suffer; that by reason of her said injuries she has become obligated for medical and surgical attention in the sum of $50, and will be required to spend large sums of money for medical and surgical attention in the future, all to her damage in the sum of $7,500, for which amount judgment is asked.

Defendant's answer is a general denial and for affirmative defense states that on November 14, 1928, plaintiff made claim in her own behalf against defendant on account of the cause of action as set forth in the amended petition; that defendant, denying liability thereon, but desiring to avoid litigation, entered into a compromise settlement with plaintiff, and paid her a certain sum of money in full settlement of any claim against defendant; that in consummation of said settlement, plaintiff executed and delivered to defendant a full release, acquittance and discharge of all causes of action "for any claim which she might or might hereafter have against this defendant" arising from or growing out of the cause of action stated in plaintiff's amended petition; that the said settlement and release so made and executed by plaintiff constitutes a complete bar to this action. A copy of said release is attached to the said answer and is in words and figures as follows:

## "THIS IS A RELEASE

"Kansas City, Mo., Nov. 14, 1928

"For and in consideration of the sum of $25.00 to me in hand paid by the Yellow Cab Company of Kansas City, Missouri, the

receipt whereof is hereby acknowledged, I do hereby release, discharge and acknowledge full satisfaction of all claims, demands and causes of action which I have or claim to have against said Yellow Cab Company of Kansas City, Missouri, its officers, ·agents or employees, and all other persons, firms and corporations, arising from or growing out of any and all personal injuries and property damages now apparent as well as those that may hereafter develop as a result of collision between Yellow Cab and another automobile at or near the intersection of 13th and McGee Streets in Kansas City, Mo., on the night of November 14th, 1928, at which time and place I was an occupant of said Yellow Cab. Claim PI 871.

''The sum herein named is the sole and only consideration for this release, and said sum so named is contractual and not a mere recital, and all understandings and agreements between the parties hereto are contained in this release.

''It being understood said Yellow Cab Company denies liability to me in any sum whatever by reason of the premises and that said sum is paid by it and accepted by me by way of compromise to the end that the expenses, delays and uncertainties of litigation may be avoided.

''In testimony where, I have hereto set my hand this 14th day of Nov., 1928. I have read and understand this release.

(Signed) ''Evelyn Tattershall,<br>''1410 North 30th St.,<br>''Kansas City, Kans.

''Witnesses:

(Signed) ''C. C. Welch.''

The reply is directed to the second paragraph of said answer and charges the release set up in the answer as a bar to plaintiff's cause of action was wrongfully and fraudulently obtained by defendant, in this, that upon being injured plaintiff was taken by defendant to St. Mary's Hospital in Kansas City, Missouri, and within less than half an hour after her arrival there, defendant's physican, Dr. Snider, at that time and at said hospital, introduced plaintiff to hip. · As soon as the examination and X-ray were completed, Dr. Snider, at that time and at said hospital, introduced plaintiff on one C. C. Welch, superintendent and claim adjuster for defendant; that Dr. Snider and said Welch took plaintiff into a private room and proposed a settlement with her; and with the purpose of inducing plaintiff then and there to settle her said claim, Dr. Snider falsely and fraudulently represented to her and assured plaintiff she had no injury of any consequence; that she had only minor bruises and she was all right, that no serious consequences would result; that there were no broken bones and that she was more frightened than injured. That Welch urged plaintiff to accept $25 in full

settlement which he then and there produced in cash, and represented to her she was not seriously injured and was really not entitled to anything; that they were just giving her $25 for nothing, and she had no just claim against defendant for any substantial sum. The reply avers that at the time and place plaintiff was highly nervous and greatly exicited and her mind was not capable of comprehending and considering her rights in the matter, and she did not have the mental power and understanding to oppose the wiles of defendant's agents, Snider and Welch; that her mind and will were subject to the will of defendant's agents in signing said release; that plaintiff did not realize and was not capable of realizing and comprehending the extent, nature and seriousness of her injuries; and believing the representations of defendant's agents that she was not seriously injured and had only minor bruises and no serious consequences would result, and that she had no claim for any substantial sum against defendant, and being deceived thereby, she was induced to and did execute said release; but as soon as she realized the seriousness and extent of her injuries and on the second day thereafter, she tendered back to defendant the said $25 so paid her, which tender was refused; that plaintiff is now ready and willing to return the amount and offers to turn same into court for the use and benefit of defendant; that said release, having been fraudulently obtained by defendant, constitutes no bar to this action.

Upon the pleadings thus made the cause was tried to a jury, resulting in a verdict for plaintiff, signed by nine jurors, in the sum of $500, and judgment was entered accordingly. Motions for new trial and in arrest were overruled, and defendant appeals.

There are three assignments of error, as follows: (1) in refusing defendant's peremptory instruction in the nature of a general demurrer to plaintiff's evidence at the close thereof; (2) in refusing defendant's peremptory instruction in the nature of a general demurrer at the close of all the evidence; (3) in refusing defendant's requested instruction 1, at the close of all the evidence, said instruction being as follows:

"You are instructed that there is no evidence in this case that defendant's physician, Dr. J. S. Snider, or defendant's representative, C. C. Welch, made any false or fraudulent representations to plaintiff with respect to the extent and nature of the injuries, if any, which she received as a result of the collision in question, and you shall find for defendant."

The three charges of error are treated by defendant under one heading in its points and authorities, to-wit, that the release executed by plaintiff, under the circumstances in evidence, is a complete defense, and the trial court erred in refusing so to hold, because (a) the alleged representations of defendant's agents were not

false and fraudulent but true; and (b) the alleged representations of defendant's agents were mere expressions of opinion.

In support of this position, defendant insists the court should have declared, as a matter of law, defendant was entitled to a judgment, by sustaining the demurrers offered at the close of plaintiff's case and again at the close of all the evidence. It is pointed out that plaintiff alleged certain false and fraudulent representations were made by defendant's agents, as an inducement for her to sign the release, as follows: (1) That she had no injuries of any consequence; (2) that she had only minor bruises and she was all right; (3) no serious consequences would result; (4) there were no bones broken, and she was more frightened than injured; (5) Mr. Welch told her "she was not injured and not entitled to anything, and she had no just claim against the defendant for any substantial sum." While defendant argues these points separately, we need not so discuss them since they all relate to the question of the sufficiency of plaintiff's evidence to support the allegations of the petition, and if the question be answered in the affirmative, the trial court did not err in refusing to sustain the demurrers, or in refusing defendant's instruction 1. It is the law, and not disputed, that in the consideration of a demurrer, plaintiff's evidence must be accepted as true and plaintiff is entitled to any and all favorable inferences to be drawn from defendant's evidence. Citations are not necessary in support of this firmly established rule.

Looking to the testimony in solving the question as to whether the demurrers were properly overruled, we find the record shows plaintiff was taken to St. Mary's Hospital within a few minutes after the injury occurred; that defendant's agents took her there; that within thirty minutes, or less, Dr. J. S. Snider, defendant's surgeon appeared, having been called by defendant; that a few minutes after Dr. Snider arrived at the hospital, C. C. Welch, superintendent of transportation and claims adjuster for defendant, appeared with a release form in his possession, and was introduced to plaintiff by Dr. Snider.

Plaintiff testified that as soon as Dr. Snider arrived, one of the Sisters connected with the hospital said to her, "The doctor is here now." That Dr. Snider and the Sister took plaintiff into a room, laid her down on a bed and the doctor examined her side, hip and head and said to plaintiff, "Your hip seems to be swelling; we will step over to the X-ray room." Plaintiff testified that with Dr. Snider's assistance she was then taken to a room where an X-ray picture was taken; that she did not know Dr. Snider, had never seen him before and did not know who he was; that the Sister took the pictures and plaintiff was then asked to step back into the room where the bed was. She lay down again and in about ten minues,

the Sister said, "Mr. Welch is here now." She stated the doctor strapped her with adhesives. She then testified, as follows:

"Q. What happened then? A. They helped me up from the bed and Mr. Welch came into the room and Dr. Snider says, 'This is Mr. Welch, the claim agent for the Yellow Cab Company, and he wants to settle with you.'

"Q. Dr. Snider said that? A. Yes.

"Q. Tell the court and jury what the Sister did then, if anything? A. The Sister was in the room at the time Dr. Snider introduced Mr. Welch and Dr. Snider says, 'You can leave the room,' to the Sister, and she left the room and Dr. Snider closed the door to and so I was in the room with Mr. Welch and Dr. Snider, both representatives of the Yellow Cab Company.

"Q. Then what happened? A. Mr. Welch says, 'I want to make a little settlement here. How would you like to settle for a new dress?' and I said, 'I don't know how badly I am hurt' and Dr. Snider spoke and says, 'You are not hurt. I just examined you,' he said, 'Your side is just swelling a little there,' and he said, 'You are bruised and you are nervous and a little frightened, but you are all right.'

"Q. And then what happened? A. I said, 'I don't believe— I don't feel right that I should sign, because really I don't know how badly I am hurt.' And Mr. Welch reached down in his pocket and picked out $25 and threw on the bed before me and said, 'Here is $25. You can buy a new dress with this. You are not hurt bad, according to what Dr. Snider says.' Dr. Snider said, 'Absolutely, you are not hurt. You are nervous more than anything else. I took an X-ray and examined you and you are not hurt. . . . .'

"Q. Tell the court and jury what Dr. Snider said, if anything, about your taking the mony? A. Dr. Snider says, 'I have examined you, you are not hurt,' and he said, 'Take the $25, you are better off. You will be back to work in two or three days and you will be making your wages and have all that $25 besides, and you will be gaining.' "

And on cross-examination, plaintiff testified:

"Q. Did you ask Dr. Snider how bad you were hurt? A. Yes, I ask him about three or four times.

"Q. And he told you he didn't think you were hurt very much? A. He told me he knew I wasn't hurt.

"Q. He told you he knew you weren't hurt? A. Yes.

"Q. Now you are positive he told you that? A. Yes."

With reference to her injuries, plaintiff testified her hip was swollen and sore, and her arm and head were hurting when she arrived at home from the hospital and was put to bed; that she suffered pain, could not sleep and was in that condition for two weeks; that she was away from work for five weeks. Dr. Sewall

examined plaintiff on the day following the alleged injury and his testimony was that he found her hip swollen, discolored and tender; that she had pain and discomfort and evidences of injury in the region of the sacroiliac, hip joint and lower back; and there was an abrasion on the side of her head. He testified, in part, as follows:

"Q. What was your diagnoisis, Doctor, with reference to that sacroiliac region? A. I would say a severe sacroiliac strain and a strain also of the hip joint ligaments and a strain of the back ligaments.

"Q. What treatment did you administer to her, Doctor? A. Immobilization by adhesive taping, rest, relief from pain by medicine and local application of liniment."

Doctor Snider testified:

"Q. Were there any ligaments torn, Doctor? A. I don't think so.

"Q. Do you know there wasn't? A. I don't think from the way she walked there was. . . .

"Q. As a matter of fact you didn't know how badly that hip was hurt that night, did you Doctor? A. I didn't think it was hurt very bad that I could see."

The testimony in behalf of defendant is flatly contradictory of that of plaintiff, especially as to the occurrences and conversations at St. Mary's Hospital. But this contradiction in the evidence merely raised a question of fact for the jury's consideration. The law in this State is well settled that release of a claim may be avoided if made by a patient relying upon a fraudulent opinion expressed by a physician as to the nature and extent of the injuries. There is testimony of record herein that plaintiff did rely upon Dr. Snider's statements and representations. It is said in Yeager v. Lead Co., 12 S. W. 520, 522:

"It is well settled that a release of a claim for personal injuries may be avoided if given in reliance on fraudulent misrepresentations made by the releasee's physician as to the nature or extent of the injuries. . . . And the question whether the misrepresentations should be regarded as misrepresentations of fact or mere expressions of opinion may be for the jury under all the evidence. Moreover, fraud may be predicated upon the giving of a mere opinion by the physician if the opinion is not honestly given. If he fraudulently gives an opinion to the patient regarding the nature and extent of the injuries or the probable time required for recovery. thereby misleading the patient into executing a release, the avoidance of the release cannot be defeated on the ground that the statement was not one of fact but merely of opinion. If a physician falsely represents that he entertains a stated opinion, this is as much a fraud

as the false representation of any other fact. Of course the evidence must show or warrant the inference that the representation was false." (Citing cases.)

To the same effect is the case, recently decided by the Supreme Court, of Macklin v. Construction Co., 31 S. W. (2d) 14.

And in Paris Manufacturing Co. v. Carles, 116 Mo. App. 581, 92 S. W. 748, 751, it is said:

"The rule now is that unless some artifice or fraud is practiced to induce a party to sign a contract, the party signing cannot avoid the obligation of the instrument by denying that he knew its contents or that it expressed the real agreement."

In Porter v. Railways Co., 165 Mo. App. 619, 148 S. W. 162, 164, we note:

"When the complaint comes from the weak, the helpless, the unfortunate and ignorant, . . . the entire aspect is changed and the law affords them protection, for the very reason that they are not able to protect themselves, and cannot be considered at fault in becoming the victim of the wrongdoer. [Hendricks v. Vivion, 118 Mo. App. 417, 94 S. W. 318.] Nor is it necessary to prove such technical incapacity as would avoid the contract regardless of the fraud. [1 Story on Contracts, par. 627; Freeland v. Eldridge, 19 Mo. 325.] It is sufficient, we take it, to show that through pain and suffering, distraction, or other circumstances the mind of the person was not in a condition to realize the antagonistic position of the adversary or to judge of the precautions to be taken against being defrauded and overreached." [Nelson v. K. C. Pub. Serv. Co., 30 S. W. (2d) 1044.]

Plaintiff's testimony as to her nervous and frenzied condition of mind at the time the release was signed would seem to be sufficient basis for the application of the rules set forth in the cited cases. She testified Dr. Snider told her at the time Welch was negotiating for a settlement:

"You are not hurt, I just examined you; your side is just swelling a little and you are bruised and a little frightened, but you are all right . . . absolutely you are not hurt, you are nervous more than anything else. I took an X-ray and examined you and you are not hurt."

Under the rulings in the opinions above cited, we hold plaintiff's evidence of sufficient strength to take the case to the jury; and there was no error in overruling defendant's demurrer at the close of plaintiff's case and again at the close of all the evidence; or in refusing defendant's instruction No. 1, in the nature of a demurrer. We find no reversible error of record. The judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.